## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DEBBIE SANTOS,                         :
                                       :
              Plaintiff                :      No. 3:13-CV-1612
                                       :
        vs.                            :      (Judge Nealon)
                                       :
CAROLYN W. COLVIN, Acting              :              **FILED**
Comissioner of Social Security,        :            **SCRANTON**
                                       :
              Defendant                :           OCT 2 8 2014

                                              PER_____
                                                    DEPUTY CLERK

### MEMORANDUM

On June 15, 2013, Plaintiff, Debbie Santos, filed this instant appeal[1] under

42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social

Security Administration ("SSA") denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and

XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 1461 et seq., 1381 et

seq. (Doc. 1). The parties have fully briefed the appeal, and the matter is now ripe

for review. For the reasons set forth below, the decision of the Commissioner

denying Plaintiff's applications for DIB and SSI will be vacated.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

**BACKGROUND**

Plaintiff protectively filed[2] her applications for DIB and SSI on February 23, 2012. (Tr. 17).[3] This claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on May 2, 2012. (Tr. 17). On May 14, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 17). Two (2) separate hearings were held on October 1, 2012, and January 9, 2013, before administrative law judge Sharon Zanotto ("ALJ"). (Tr. 17, 34, 82). At the October 1, 2012 hearing, Plaintiff testified. (Tr. 82). At the January 9, 2013 hearing, Plaintiff and vocational expert Brian Bierley ("VE") testified. (Tr. 34). On January 14, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff's impairments did not meet or medically equal any impairment Listing, and she could perform less than a full range of light work, with avoidance of concentrated exposure to dust, fumes, odors, gases and chemicals, avoidance of hot and cold temperatures, only

---

2. Protective filing is a term for the first time an individual contacts the SSA to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on August 15, 2013. (Doc. 9).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the SSA.

2

occasional interaction with supervisors, and no interaction with coworkers or the public. (Tr. 20-22).

On March 11, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 10). On April 17, 2013, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-5). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on June 15, 2013. (Doc. 1). On August 15, 2013, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed the brief in support of her complaint on September 27, 2013. (Doc. 10). Defendant filed a brief in opposition on November 15, 2013. (Doc. 13). Plaintiff filed a reply brief on November 25, 2013. (Doc. 14).

Plaintiff was born in the United States on March 18, 1978, and at all times relevant to this matter was considered a "younger individual." [5] (Tr. 94, 272). Plaintiff did not obtain her high school diploma or GED, and can communicate in English. (Tr. 275, 277). Her employment records indicate that she previously worked as a candy packer, certified nurse's assistant, and a cashier. (Tr. 277).

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

The records of the SSA reveal that Plaintiff had earnings in the years 1994 through 2011 . (Tr. 149). Her annual earnings range from a low of no income in 2010 to a high of twenty-five thousand three hundred eighty dollars and thirty-eight cents ($25,380.38) in 2002. (Tr. 264). Her total earnings during those seventeen (17) years were one hundred forty-eight thousand fifty-six dollars and fifty-two cents ($148,056.52). (Tr. 264).

Plaintiff's alleged disability onset date is December 22, 2011. (Tr. 272). The impetus for her claimed disability is a combination of the following: asthma, breathing problems, depression, heart problems, anxiety, panic disorder, blood clot disorder, and ovary problems. (Tr. 276). In a document entitled "Function Report - Adult" filed with the SSA in March of 2012, Plaintiff indicated that she was married, and lived with and cared for her husband, five (5) sons and pets. (Tr. 292-293). She indicated that she needed help caring for her family and pets because she would "get tired[,] overwhelmed[, and her body would] shut[] down." (Tr. 293). She was able to care for her personal needs. (Tr. 293). She also noted that she could prepare meals on a weekly basis, but preferred to cook "easy oven things." (Tr. 294). She was able to clean her house and do laundry. (Tr. 294). Aside from doctors' visits, school meetings, and a monthly grocery store outing, she "hardly ever" went outside, and needed someone to accompany her because

she had a phobia of being alone. (Tr. 294-296). She indicated that she would drive and walk when she went out. (Tr. 295). However, she could only walk about one (1) block, or for five (5) to ten (10) minutes, before she would become short of breath. (Tr. 297).

Regarding concentration and memory, Plaintiff stated that she could pay attention for twenty (20) to thirty (30) minutes, but could not complete tasks, could not follow written or spoken instructions well, and needed reminders to take care of her personal needs and to take medicine. (Tr. 294, 297). She could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 295).

Socially, Plaintiff indicated that she no longer had any hobbies or interests, and did not spend time with others. (Tr. 296). She had problems getting along with others, including friends, family, neighbors and authority figures, because of her "different personalities." (Tr. 297-298). In the function report, when asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check using hands. (Tr. 297).

In her Supplemental Function Questionnaire, Plaintiff indicated that her pain began on October 18, 2011, was caused by asthma, and was located in her "chest, lungs, hands, arms, legs, [and] head." (Tr. 300). She noted that the following activities caused her pain: "clean[ing], laundry, cooking, dressing [her]

5

kids [and] [] put[ting] their shoes on." (Tr. 300). Her pain occurred every day,

would last for fifteen (15) to twenty (20) minutes on and off throughout the day,

and was worse when she was attending to her family's needs. (Tr. 300). She

stated that her eating habits had changed because of her pain, and that while she

lost and gained weight from her medication, she was purposefully trying to lose

weight, as she stated, "140 [pounds] is my goal." (Tr. 301). To relieve her pain,

she took Vicodin, which would help for a "couple hours." (Tr. 301). She did not

wear or use any devices such as a brace or a TENS unit to relieve her pain. (Tr.

301). She indicated that she was referred to a psychiatrist to help her cope with

her pain. (Tr. 301).

At her October 1, 2012 hearing, Plaintiff testified that she did not perform

chores around the house, but rather her husband was the one who cooked, cleaned,

did the laundry, and took care of their sons since she became sick. (Tr. 123). She

was unable to walk more than two (2) flights of stairs without resting. (Tr. 125).

She stayed in bed most days, staring at her fish in a nearby fish tank. (Tr. 129-

130). She testified that she had issues getting along with supervisors and

coworkers because she often felt insubordinate, and if she did not like what was

said to her at work, she would yell at whomever was speaking to her. (Tr. 132).

She also stated that she had difficulty concentrating, and needed reminders to take

her medicine and attend appointments. (Tr. 132-133). With regards to sleep, she testified that she had insomnia due to nightmares and urinary frequency. (Tr. 133-134). Finally, she testified that she often had suicidal thoughts and thoughts about harming her children. (Tr. 135).

At her second hearing on January 9, 2013, which was conducted after Plaintiff submitted additional medical records, Plaintiff testified that due to a combination of asthma, urinary frequency and incontinence, and mental health issues, she was unable to work since she was terminated from her job as a certified nurse's assistant at Claremont Nursing home in December of 2011. (Tr. 40-43, 64). She stated that she received food stamps and medical and cash assistance, and that her husband did not work in order to take care of her and the children. (Tr.43). Plaintiff indicated that she could not work primarily because she experienced frequent panic attacks that caused her to become physically and verbally violent towards herself and others, including pulling her own hair, scratching herself, and yelling at her children. (Tr. 43-46, 68). She was diagnosed as having panic attacks by Dr. De La Cruz and Dr. Robin Miller, which occurred about two (2) times per day before her father's death in March of 2012, and increased to four (4) to five (5) times a day after his death. (Tr. 46, 48). She stated that since March of 2012, a counselor from Child and Youth Services

("CYS") would visit her once a week to counsel her and her children, and a caseworker would visit her once a month to discuss the family's evaluation for that month. (Tr. 55-56). Regarding medications, she used a nebulizer, rescue inhaler, Symbicort and occasional Prednisone tapers for her asthma, and Cymbalta, Xanax and Lithium for her mental health issues. (Tr. 66, 69).

## MEDICAL RECORDS

On December 28, 2011, Plaintiff presented to the emergency room ("ER") at Holy Spirit Hospital for a cough and chest congestion. (Tr. 448). Plaintiff was alert, oriented, and cooperative, in moderate distress, and denied having any thoughts of hurting herself or others. (Tr. 450, 457). Her chest x-ray was negative for any findings. (Tr. 453). Her physical exam noted bilateral expiratory wheezing, and she was diagnosed with bronchitis. (Tr. 454, 457). Plaintiff was given a nebulizer breathing treatment with Albuterol and Atrovent, and her bilateral expiratory wheezing diminished as a result. (Tr. 454-455).

On December 30, 2011, Plaintiff again presented to the ER at Holy Spirit Hospital for a severe cough with accompanying sweating and chills. (Tr. 503-505). Plaintiff was noted to be alert, anxious, and in severe distress. (Tr. 505). Her past medical history noted asthma, depression, anxiety, Chronic Obstructive Pulmonary Disease ("COPD"), and stress incontinence. (Tr. 507). Bilateral

wheezing was noted.  (Tr. 508).  The principal diagnosis from this visit was asthma with an acute exacerbation, and her secondary diagnoses included anxiety, depressive disorder, and stress incontinence.  (Tr. 503).  As a result, she was admitted to the Medical-Surgical floor, and given nebulizer treatments, a cough suppressant, and intravenous ("IV") medrol.  (Tr. 508).  The assessment notes from this visit state that Plaintiff had acute bronchitis versus COPD exacerbation, that her depression and anxiety were uncontrolled, and that she understood and agreed with the treatment plan.  (Tr. 508).  Her medications upon discharge on December 31, 2011 included the following: Robitussin, Medrol dose pack, Avelox, Ativan, Combivent inhaler, and Effexor.  (Tr. 510).

On January 4, 2012, Plaintiff had a follow-up appointment with Vanitha Abraham, M.D. to assess her asthma and bronchitis.  (Tr. 535).  She reported that she had a cough, and awakened with dyspnea, a wheeze, a dry cough, and hoarseness.  (Tr. 535).  It was noted that she was oriented to time, place, person, and situation.  (Tr. 536).  She was given an in-office nebulizer treatment, and was sent home with a nebulizer machine and asthma medication.  (Tr. 536).

On January 25, 2012, Plaintiff presented to the Dillsburg Family Health Center, and was seen by Dr. Abraham for complaints of a cough.  (Tr. 533).  She was noted as being very upset and panicky, and was "freaking out."  (Tr. 533).

9

Plaintiff was prescribed Methylprednisone for her cough. (Tr. 534).

On January 27, 2012, Plaintiff presented to Dillsburg Family Health Center, where she was examined by Dr. Abraham for complaints of a productive cough and a recent bout of bronchitis. (Tr. 531-532). She was noted as being oriented to time, place, person and situation, and demonstrated the appropriate mood and affect. (Tr. 531). Upon Dr. Abraham's recommendation, Plaintiff was immediately transferred and admitted to the Intensive Care Unit ("ICU") at Holy Spirit Hospital for breathing difficulties and severe chest pain that had been occurring for four (4) months. (Tr. 466, 469, 532). She was seen by Rajwinder Nagra, M.D. (Tr. 472). Her past medical history indicated she had asthma and depression. (Tr. 469). Her exam noted that she was anxious and tearful, but also that she was alert and in no apparent distress. (Tr. 469, 471). Plaintiff denied having any suicidal or homicidal thoughts. (Tr. 471). She had acute bilateral expiratory wheezing, and a low pulse oxometry reading. (Tr. 470, 472). Her medications list included Xanax, Symbicort, Ambien, Prednisone, Avelox, and Promethazine. (Tr. 471). After multiple pulmonary tests, she was again diagnosed with bronchitis with an acute exacerbation of chronic obstructive asthma. (Tr. 466, 472). Her secondary diagnoses included acute respiratory failure, major depressive disorder that was recurrent and severe without psychotic features, a

10

cardiac dysrhythmia, and abnormal glucose. (Tr. 466, 470). On January 28, 2012,

Plaintiff had a psychiatric consultative examination while admitted to Holy Spirit

Hospital. (Tr. 473-473). The examination indicated that Plaintiff was oriented to

time, place and person, had an intact memory, was anxious and depressed, and had

normal speech and a coherent thought process. (Tr. 474). She denied

hallucinations, and suicidal and homicidal ideations. (Tr. 474). She was

diagnosed with recurrent and severe major depressive disorder without psychotic

thoughts. (Tr. 474). On January 29, 2012, Plaintiff was placed on a continuous

invasive mechanical ventilator with the insertion of an endotracheal tube for less

than ninety-six (96) consecutive hours. (Tr. 467). She remained in the hospital

until February 4, 2012. (Tr. 466, 476). Her discharge papers stated that she was

diagnosed with the following: acute bronchial asthma exacerbation, anxiety, major

depressive disorder, non-sustained ventricular tachycardia, hypertension, and

dysfunctional uterine bleeding. (Tr. 477). Her medications upon discharge

included the following: Avelox, Xanax, Ambien, Symbicort, Atrovent,

Prednisone, Wellbutrin, and Cardizem. (Tr. 477). She was instructed to follow-up

with Dr. Thevenin-Smaltz in one (1) week and Dr. Long in two (2) weeks. (Tr.

477).

On February 6, 2012, Plaintiff presented to Dillsburg Family Health Center

for a follow-up after her recent hospitalization at Holy Spirit. (Tr. 528). She reported that she was weak and not able to walk. (Tr. 528). She noted that she was irritable, fearful, anxious, and depressed, and had difficulty concentrating, an inability to focus, mood swings, psychiatric symptoms, and sleep disturbances. (Tr. 529). She was negative for suicidal ideation. (Tr. 529). Her psychiatric exam noted that she exhibited compulsive behavior and poor judgment, did not behave appropriately for her age, did not interact appropriately, did not have pressured speech, and did not demonstrate the appropriate mood or affect. (Tr. 529). The assessment plan was to continue with the asthma and anxiety medication she was already taking. (Tr. 530).

On February 11, 2012, Plaintiff presented to the ER at Holy Spirit Hospital for right arm numbness, swelling, and mottling, and was seen by Amy Fajando, M.D. (Tr. 436, 728). Her assessment indicated that her breathing was normal, her airway was patent, she was alert, oriented and cooperative, and she did not have any thoughts of hurting herself or others. (Tr. 438). She also was noted as having intact sensation and motor skills, normal speech, and normal cognition. (Tr. 444). Plaintiff reported that she felt anxious. (Tr. 446). The physician's notes, including diagnoses and treatment recommendations, are largely illegible. (Tr. 443-446).

On February 14, 2012, Plaintiff presented to the ER at Holy Spirit Hospital with a history of asthma, depression and a prior deep vein thrombosis ("DVT") in her right arm, and complaints of stabbing chest pain from her left shoulder blade into her chest wall with accompanying nausea, sweating, and shortness of breath rated as a ten (10) on a scale of one (1) to ten (10). (Tr. 425, 433). She denied any recent thoughts of hurting herself. (Tr. 426). The physical exam indicated that Plaintiff was not in acute distress, was alert, had a normal mood and affect, had normal breathing sounds, a regular heart rate, and a normal complete blood count (CBC). (Tr. 426, 434). The clinical impression indicated that Plaintiff was diagnosed with anxiety and discharged the same day. (Tr. 434).

On February 28, 2012, Plaintiff had an appointment at Dillsburg Family Health Center for a follow-up visit regarding anxiety and a prior DVT. (Tr. 525). She reported that she had been experiencing anxious, fearful and compulsive thoughts, a decreased need for sleep, a depressed mood, difficulty concentrating, difficulty falling and staying asleep, a diminished interest in pleasure, excessive worry, fatigue, loss of appetite, poor judgment, racing thoughts, restlessness, hopelessness, and paranoia. (Tr. 525). She was irritable, did not behave appropriately for her age, and did not exhibit the appropriate mood or affect. (Tr. 527). She exhibited normal judgment, and reported that she did not have suicidal

ideations. (Tr. 527). Her anxiety was associated with headache, nausea, sweating and trembling. (Tr. 525). The treatment recommendations from this visit included psychotherapy, a selective seratonin reputake inhibitor ("SSRI"), a tricyclic antidepressant, an antipsychotic, a suicide risk assessment, and an anxiolytic. (Tr. 525). Her medications list from this visit included Ambien, Avelox, Combivent, Coumadin, Lorazepam, Lovenox, Polymyxin, Prenisone, ProAir, Promethazine, Symbicort, Wellbutrin, and Xanax. (Tr. 525-526).

On March 1, 2012, Sylvestre De La Cruz, M.D. performed an adult psychiatric evaluation on Plaintiff. (Tr. 549). Dr. Cruz noted that Plaintiff's affect was depressed, and her mood was restricted. (Tr. 549). She denied experiencing any suicidal and homicidal thoughts, delusions, or hallucinations. (Tr. 549). Plaintiff noted that her panic attack symptoms consisted of sweating, shaking, fidgeting, and chest tightness. (Tr. 547-548). The mental status examination noted that Plaintiff was kempt in appearance, cooperative during the interview, and was oriented in time, place, and person. (Tr. 548). She had grossly intact immediate, recent and remote memory, and coherent and goal-directed speech. (Tr. 548-549). She had fairly good eye contact, was organized in thinking, was of average intelligence, and exhibited sound hypothetical judgment. (Tr. 548-549). Her Global Assessment Function ("GAF") score at this visit was between a fifty-

five (55) and sixty (60), and her prognosis was fair. (Tr. 549-550). This evaluation resulted in diagnoses of panic disorder without agoraphobia, and major depressive disorder that was recurrent and moderate to severe without psychotic features. (Tr. 549).

On March 14, 2012, Plaintiff was evaluated by consultative examiner James Long, M.D. (Tr. 555). The notes from this exam state that Plaintiff was oriented to time, place, person, and situation. (Tr. 562). He opined that Plaintiff had no limitations in lifting, standing and walking, sitting, pushing and pulling, postural activities, or other physical functions. (Tr. 554-555). He indicated that with regards to environmental restrictions, she would need to avoid areas with poor ventilation due to her asthma. (Tr. 555).

On March 30, 2012, Plaintiff presented to the ER at Holy Spirit Hospital with complaints of shortness of breath, coughing, and wheezing. (Tr. 661). Dr. Luke Chetlen evaluated Plaintiff, and found her to be "tachypneic with increasing work of breathing and with poor air movement." (Tr. 661). She was emergently intubated. (Tr. 661). Her assessment noted that she was critically ill, was in respiratory failure, had an acute exacerbation of asthma, and a history of anxiety, a DVT in her upper right extremity, and hypertension. (Tr. 662). She was admitted to the ICU under the care of Dr. Foster, and was placed on full ventilator support,

given IV antibiotics and solu-medrol, and a Nicoderm patch. (Tr. 662).

On April 1, 2012, while still hospitalized, Plaintiff was evaluated by pulmonologist Henry Ostman, M.D. (Tr. 665-667, 669). During this examination, Plaintiff reported that she had episodic shortness of breath, chest pain, and wheezing, but the exam was negative for all other findings. (Tr. 666). Dr. Ostman noted that he heard no wheezing either inspiratory or expiratory, and no dullness to percussion. (Tr. 666). Plaintiff's speech was fluent and eloquent, and her gaze was intact. (Tr. 666). On April 2, 2012, Plaintiff was discharged from the hospital. She was diagnosed by Richard Schreiber, M.D. with the following: acute hypoventilatory respiratory failure, acute severe asthma, anxiety, depression, GERD, DVT of the right upper extremity, hypertension, and possible allergies. (Tr. 668). Plaintiff's discharge medications included the following: Xanax, Ambien, Symbicort, Flovent, Combivent, Prednisone, Flonase, Ventolin, Prozac, Cardizem, the Nicotine patch, and Vicodin. (Tr. 668).

On April 17, 2012, Plaintiff presented voluntarily to the emergency room ("ER") at Holy Spirit Hospital, and was subsequently admitted to Holy Spirit Behavioral Health, after experiencing homicidal and suicidal thoughts while driving erratically with her children in the car due to an argument with her husband. (Tr. 715, 719). She was examined by Robin Miller, M.D., who found

16

that Plaintiff was awake and alert, appeared to be her stated age, had an elevated affect and mood, was difficult to interrupt, had pressured speech, was in a hypomanic state, had intact short and long-term memory, did not show evidence of psychosis, was oriented in all spheres, and had fair insight and judgment. (Tr. 572, 716). She reported that she had an extremely high energy level, would "run[] around the house doing all the chores in a very high energy way," was sleeping well, denied having auditory or visual hallucinations or paranoia, and had poor appetite. (Tr. 571). She rated her depression at a four (4) out of ten (10). (Tr. 571). Dr. Miller gave Plaintiff a GAF score of twenty (20) to twenty-five (25), and noted that her GAF was probably about a forty (40) to forty-five (45) within the past year. (Tr. 717). Upon discharge on April 20, 2012, Dr. Miller diagnosed Plaintiff with Bipolar disorder, type I, and chronic post-traumatic stress disorder, and gave Plaintiff a GAF score of fifty (50). (Tr. 719, 793).

On April 20, 2012, Plaintiff's medical records were reviewed by a psychological state agency physician named Michael Sumikski, Ph.D for purposes of determining Plaintiff's limitations and restrictions resulting from her mental health impairments. (Tr. 141-146, 151-156). Based on a review of Plaintiff's self-reported work history and function report that were part of the disability record, and of the records from Plaintiff's visits to Holy Spirit Hospital in March and

April of 2012 and to the office of Dr. Long, Dr. Suminski concluded that Plaintiff had the following medically determinable impairments: a severe disorder of the female genital organs, severe asthma, a non-severe affective disorder, and a non-severe anxiety disorder. (Tr. 145, 155). Dr. Suminski's psychiatric review of Plaintiff's mental health impairments concluded that Plaintiff did not meet the aforementioned criteria for Listings 12.04 and 12.06, that "[t]his [was] a case of minimal psychological impairment," and that Plaintiff was "very functional" because she "care[d] for her 5 children, prepare[d] meals, [did] housework and laundry, [drove], shop[ped] and manage[d] money." (Tr. 145-146, 155-156).

On May 5, 2012, medical state agency physician Vrajlal Popat, M.D. reviewed Plaintiff's records for purposes of determining Plaintiff's limitations and restrictions resulting from her physical impairments. (Tr. 146-148, 156-158, 161). Based on a review of Plaintiff's visit with Dr. Long in March of 2012, Dr. Popat concluded that Plaintiff's primary diagnosis was asthma, and her secondary diagnosis was "female genital ulcerative disease." (Tr. 161-162). Dr. Popat opined that as a result of these physical impairments, Plaintiff could occasionally lift twenty (20) pounds, frequently lift ten (10) pounds, stand/walk and sit for about six (6) hours in an eight (8) hour workday, was unlimited in pushing and pulling, and had no postural, manipulative, visual or communicative limitations.

(Tr. 146-147, 156-157).  He further opined that with regards to environmental limitations, Plaintiff should avoid concentrated exposure to heat, cold, and humidity, and avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation.  (Tr. 147-148, 157-158).

On May 31, 2012, Plaintiff had a follow-up appointment with Dr. De La Cruz for medication management after her second hospital stay in April of 2012. (Tr. 794).  Dr. De La Cruz noted that Plaintiff had good hygiene, calm motor behavior, a restricted affect, an anxious mood, a coherent thought process, normal thought content, an intact memory, no suicidal or homicidal thoughts or plans, and no hallucinations.  (Tr. 796).

On June 19, 2012, Plaintiff again went to the ER at Holy Spirit Hospital due to increased irritability, insomnia, suicidal ideations, and paranoia.  (Tr. 708, 712). Dr. Miller noted that Plaintiff was experiencing an increase in her psychiatric symptoms of mood dyscontrol, anger, and irritability.  (Tr. 709).  Plaintiff was prescribed Alprazolam, Trazadone, Lithium, Divalproex, Clonazepam, Tramadol, Risperadone, and Lorezapam.  (Tr. 330-331).  As a result of Bipolar I disorder, COPD, asthma, post-traumatic stress disorder ("PTSD"), personality disorder with borderline features, a prolapsed bladder, GERD, sleep apnea, cardiac dysrhythmia, and migraines, Dr. Miller opined that Plaintiff was disabled for a period of twelve

(12) months or more. (Tr. 582-583, 710).

On August 8, 2012, Plaintiff had a follow-up appointment with Dr. De La Cruz. (Tr. 797). Dr. De La Cruz noted that Plaintiff had good hygiene, calm motor behavior, appropriate affect, an anxious and depressed mood, a coherent thought process, normal thought content, intact memory, no suicidal or homicidal ideations or plans, and no hallucinations. (Tr. 797).

On September 21, 2012, Plaintiff presented to the ER at Carlisle Regional Medical Center with complaints of a chronic migraine headaches that had been occurring for two (2) weeks. (Tr. 828). The notes from this visit stated that Plaintiff was in no apparent distress, had appropriate behavior for her age, was cooperative, had an oriented verbal response, and "obey[ed] commands." (Tr. 829). Plaintiff was diagnosed with a migraine, and discharged the same day. (Tr. 830).

On October 3, 2012, Plaintiff had a follow-up appointment with Dr. De La Cruz. (Tr. 797). Dr. De La Cruz noted that Plaintiff had good hygiene, calm motor behavior, appropriate affect, an anxious and depressed mood, a coherent thought process, normal thought content, intact memory, no suicidal or homicidal ideations or plans, and no hallucinations. (Tr. 797).

On October 10, 2012, Plaintiff had an appointment with Charles Gbadouwey, M.D. at Lung, Asthma, Sleep Associates. (Tr. 799). Plaintiff reported that she had been experiencing a non-productive cough, pleuritic chest pains, palpitations, nocturnal wheezing, and asthma exacerbation with changes in temperature and emotional stress. (Tr. 799). Dr. Gbadouwey noted that Plaintiff was pleasant, awake, and oriented to time, place, person, and situation. (Tr. 800). Her assessment indicated moderate, persistent asthma. (Tr. 801).

On October 24, 2012, Plaintiff had another appointment with Dr. Gbadouwey for complaints of dyspnea when climbing stairs, a non-productive cough, and pleuritic chest pains. (Tr. 806). She reported nocturnal wheezing, palpitations, and asthma exacerbation due to changes in temperature and emotional stress. (Tr. 806). Dr. Gbadouwey noted that a CAT scan performed on October 17, 2012 showed no evidence of subglottic stenosis, but that mucous retention cyst of the sinuses was seen, and enlarged tonsils were noted. (Tr. 806). Dr. Gbadouwey also noted that Plaintiff was pleasant, awake, alert, and oriented to time, place, person, and situation. (Tr. 807). Her past medical history included bipolar disorder, chronic migraines, obesity, gastroparesis, localized osteoarthritis of the knee, palpitations, and a tubal litigation. (Tr. 806). Her assessment from this visit reported Plaintiff had tonsillar hypertrophy and moderate, persistent

asthma. (Tr. 808). Dr. Gbadouwey ordered an overnight sleep study, which was performed on November 2, 2012, and found no obstructive sleep apnea. (Tr. 805, 808). Dr. Gbadouwey also ordered a six (6) minute walk study, which was performed on November 8, 2012, and revealed that Plaintiff did not need oxygen at rest or with activity. (Tr. 811).

On November 28, 2012, Plaintiff had a follow-up appointment with Dr. De La Cruz. (Tr. 841). She presented with a normal appearance, fair hygiene, a restricted affect, depressed mood, coherent thought process, normal thought content, and an intact memory. (Tr. 841). She reported she had not been experiencing hallucinations, or suicidal or homicidal ideations or plans. (Tr. 841). Plaintiff did not show for her follow-up appointment with Dr. De La Cruz on January 23, 2013. (Tr. 842).

**STANDARD OF REVIEW**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.[6] (Tr. 19). The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled. (Tr. 19-28).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of December 22, 2011. (Tr. 19).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "asthma, tachycardia, Major Depressive Disorder, Panic Disorder with agoraphobia, and Personality Disorder

---

6. Disability insurance benefits are paid to an individual if that individual is disabled and insured, that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the date last insured. It is undisputed that with respect to her DIB application, Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 19). SSI is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

(20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 19).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 20).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of light work, but must avoid concentrated exposure to dust, fumes, odors, gases and chemicals, all exposure to areas with poor ventilation, concentrated exposure to hot and cold temperature extremes, and was limited to only occasional interaction with supervisors, and no interaction with coworkers or the public. (Tr. 22). Specifically, the ALJ stated the following:

> As discussed above, the evidence of record establishes that [Plaintiff's] allegations regarding her symptoms and limitations are not entirely credible. However, the undersigned has accommodated some degree of [Plaintiff's] symptoms and limitations related to her impairments in her [RFC] by limiting her to a range of work at the light exertional level that includes environmental limitations. Additionally, to accommodate some degree of her social functioning limitations[,] the undersigned has limited [Plaintiff's] interaction with supervisors to an occasional basis and provided her with the limitation of precluding her from having any interaction with the public or coworkers.

(Tr. 25, 26).

In consideration of Plaintiff's RFC, the ALJ determined Plaintiff "was capable of performing past relevant work as a mail sorter. . . (20 C.F.R. 404.1565 and 416.965)." (Tr. 26). Because the ALJ determined that Plaintiff could perform past relevant work, the sequential evaluation process ended at step four (4).

The ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the alleged onset date of December 22, 2011, and the date of the ALJ's decision. (Tr. 27).

## **DISCUSSION**

On appeal, Plaintiff asserts the following: (1) the ALJ erred at step three of the sequential evaluation process in determining that Plaintiff did not meet the "B" or "C" criteria of Listing 12.04 and in failing to find greater restrictions in the applicable four (4) broad functional areas; (2) the ALJ did not use the correct legal standard when weighing the medical opinions of the treating source; and (3) the ALJ erred in determining that Plaintiff could perform past relevant work because the hypothetical presented to the VE was different from the RFC assessment. (Doc. 10, p. 5).

Defendant disputes these claims, asserting the following: (1) substantial evidence supports the ALJ's decision that Plaintiff's mental impairments did not

meet Listing 12.04; (2) the ALJ properly afforded weight to the physicians'

opinions; and (3) the ALJ properly determined Plaintiff's RFC and relied upon the

VE's testimony.  (Doc. 13, pp. 6-16).

In her reply brief, Plaintiff contends that: (1) the Commissioner failed to

rehabilitate the ALJ's decision; (2) substantial evidence does not support the

ALJ's determination that Plaintiff's mental impairments do not meet Listing

12.04; (3) the ALJ did not properly weigh the medical opinion evidence; and (4)

the VE testimony was unreliable.  (Doc. 14, pp. 1-7).

### 1.   <u>Step Three Analysis</u>

Plaintiff argues that with regards to Impairment Listing 12.04, the ALJ erred

in finding that she did not meet criteria "B" or "C."  (Doc. 10, pp. 8-15).

Regarding the "B" criteria, Plaintiff alleges that ALJ's findings regarding the four

(4) broad functional areas are not supported by substantial evidence because: (1)

Plaintiff had more than "mild" restrictions in her activities of daily living; (2)

Plaintiff had more than "moderate" difficulties in social functioning; (3) Plaintiff

had more than "mild" difficulties with concentration, pace or persistence; and (4)

Plaintiff had experienced repeated episodes of decompensation.  (<u>Id.</u> at 8-14).

Plaintiff argues that she met all of the "C" criteria because: (1) she had

experienced repeated episodes of decompensation; and (2) she had affective

disorder lasting for more than two (2) years. (Id. at 14-15).

A claimant bears the burden of showing that her impairment meets or equals a listed impairment. Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 120 n.2 (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)). Listing 12.04, Affective Disorders, consists of paragraph A criteria that involves a set of medical findings, paragraph B criteria that involves a set of impairment-related functional limitations, and paragraph C criteria that involves a set of additional functional limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). The required level of severity for Listing 12.04 is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The paragraph B requirements of Listing 12.04 requires two (2) of the following: (1) marked[8] restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).

Listing 12.04 paragraph C requires demonstration of a medically

---

8. A marked limitation is one that seriously interferes with a claimant's ability to function appropriately, independently, and effectively on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

documented history of a chronic affective disorder of at least two (2) years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medical or psychosocial support, and one (1) of the following: (1) repeated and extended episodes of decompensation; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one (1) or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(1)-(3).

Furthermore, when evidence documents a severe medically determinable mental health impairment, and the administrative law judge so found at step two (2) of the sequential evaluation process, as in the present case, the ALJ must comply with the evaluation technique outlined in 20 C.F.R. § 416.920a ("Evaluation of mental impairments").  Section 416.920a states in pertinent part as follows:

> (a) General. . . when we evaluate the severity of mental impairments for adults . . . we must follow a special technique . . . We describe this special technique in paragraph (b) through (e) of this section. . .

(b) Use of technique. . .

> (2) We must . . . rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

(c) <u>Rating the degree of functional limitation</u>. . .

> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. . .
>
> <u>(4) When we rate the degree of limitation in the first three functional areas . . . we use the following five-point scale. None, mild, moderate, marked, and extreme.</u> . . .

(d) Use of the technique to evaluate mental impairments. . .

> (3) If we find that you have a severe impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

(e) Documenting application of technique. . .

> (4) At the administrative law judge hearing and Appeals Council level, the written decision must incorporate the pertinent findings and conclusions based on the technique. . . <u>The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.</u>

20 C.F.R. § 416.920a (emphasis added).

In the present case, the ALJ determined that Plaintiff's severe mental health impairments, including Major Depressive Disorder, Panic Disorder with agoraphobia, and Personality Disorder, did not meet criteria "B" or "C" of Listing 12.04. With regards to criteria "B," the ALJ determined that Plaintiff had: (1) mild restriction in activities of daily living because she was able to prepare her meals, drive a car, and handle her household finances; (2) moderate restrictions with social functioning because, while she did not go anywhere or see others on a regular basis and had problems getting along with others, she was noted to be "pleasant, kind, and cooperative by health care providers with whom she treated;" (3) mild difficulties with concentration, persistence, or pace because while she reported having difficulty paying attention and following instructions, she was assessed as "having intact immediate, recent, and remote memory during a mental status examination. . . . [and] as having a coherent thought process;" and (4) only two (2) episodes of decompensation of extended duration. (Tr. 21).

Regarding criteria "C," the ALJ stated the following:

> . . . [T]here is no indication that [Plaintiff] has a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptom or signs currently attenuated by medication or psychosocial support, and either repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted

in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate; or a current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

(Tr. 22). Thus, the ALJ complied with Section 416.920a in his analysis of the "B" and "C" criteria. In evaluating the degree of functional limitations Plaintiff's mental health impairments caused, the ALJ identified the specific degree of limitations in each area, i.e., none, mild, moderate, marked, and extreme. (Tr. 21).

Moreover, a review of the objective medical evidence supports the ALJ's decision that the "B" and "C" criteria were not met. Substantial evidence supports the ALJ's analysis of the four (4) broad functional categories of criteria "B" because: (1) regarding activities of daily living, Plaintiff reported she was able to take care of her hygiene, take care of her children and her husband, prepare meals, drive a car, handle the household finances and clean; (2) regarding social functioning, Plaintiff was noted by different physicians on many occasions to be pleasant, cooperative, and kind, and did not have thoughts of hurting either herself or others; (3) regarding concentration, persistence, or pace, Plaintiff was assessed as having intact immediate, recent and remote memory, a coherent thought process, an oriented verbal response, and normal thought content ; and (4) Plaintiff

35

experienced only two (2) periods of decompensation that were related to her

mental health impairments because the third possible episode in January of 2012

was due to asthma.  (Tr. 293-298, 426, 438, 450, 457, 471, 474, 525-537, 548-549,

571-572, 708-712, 715-719, 788, 796-797, 801, 807, 829, 841-842).  Because

Plaintiff's mental health impairments did not cause one "marked" limitation and

"repeated" episodes of decompenation or at least two (2) "marked" limitations, it

is determined that the ALJ appropriately found that Plaintiff's mental health

impairments did not satisfy criteria "B" of Listing 12.04.

Substantial evidence also supports the ALJ's analysis of criteria "C"

because the medical record does not reflect that Plaintiff had a medically

documented history of a chronic affective disorder of at least two (2) years'

duration that has caused more than a minimal limitation of ability to do basic work

activities with symptoms or signs currently attenuated by medication of

psychosocial support.  (Tr. 293-298, 426, 438, 450, 457, 471, 474, 525-537, 548-

549, 571-572, 708-712, 715-719, 788, 796-797, 801, 807, 829, 841-842).  As

discussed, there were no more than two (2) episodes of decompensation each of

extended duration that resulted from Plaintiff's mental health impairments.  There

also was no medically documented history of a residual disease process that

resulted in such marginal adjustment that even a minimal increase in mental

36

demands or change in the environment would be predicted to cause Plaintiff to decompensate, nor was there evidence of a current history of one (1) or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (Tr. 146, 293-298, 426, 438, 450, 457, 471, 474, 525-537, 548-549, 571-572, 708-712, 715-719, 788, 796-797, 801, 807, 829, 841-842). Accordingly, there is substantial evidence to support the ALJ's determination that Plaintiff's mental health impairments did not meet criteria "B" or "C" of Listing 12.04.

### 2.   **Medical Opinion Evidence**

Plaintiff alleges that the ALJ improperly afforded limited weight to the opinion of Dr. Miller and state agency physician Dr. Suminski, substituted her own opinion for those of the medical experts, and presented "an internally inconsistent opinion." (Doc. 10, pp. 19-22). Defendant disputes these contentions. (Doc. 13, pp. 10-12).

In the present case, the ALJ gave limited weight to the opinions of Dr. Long because "it [was] consistent with the treating source records and clinical examination findings on a longitudinal basis . . ." (Tr. 25). He gave limited weight to the opinion of Dr. Suminski, the state agency psychological consultant, because "it [was] not consistent with the entirety of the evidence of record . . ."

(Tr. 25). The ALJ also gave limited weight to the opinion of Dr. Miller because it was "conclusory in nature in that Dr. Miller provided no explanation for her opinion." (Tr. 25). Ultimately, the ALJ gave significant weight to the opinion of Dr. Popat because "it [was] consistent with the evidence of record, including treating source records and clinical examination findings on a longitudinal basis." (Tr. 25).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). However, the ALJ is permitted to give great weight to a non-examining, non-treating physician's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff

could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of the entire record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Upon review of the entire record and the ALJ's RFC determination, it is

determined that the ALJ improperly afforded weight to the two (2) state agency consultants in reaching her RFC determination because the state agency examination record indicates that the whole medical record was not available for review by either Dr. Suminski or Dr. Popat. (Tr. 142-144, 146-148). Dr. Popat's opinion was based on a review of one medical record from Holy Spirit that concerned Plaintiff's physical impairments, not her mental health impairments. (Tr.25, 146-148). Therefore, Dr. Popat's medical opinion did not involve an evaluation of Plaintiff's mental health impairments, and was not well-supported by the entire evidence of record. Dr. Suminski also did not have the entire medical record for review in determining Plaintiff's functional limitations resulting from her mental health impairments. (Tr. 142-144). In fact, in response to the question, "[a]re there medical source and/ or other source opinions about the individual's limitations or restrictions which are more restrictive than your findings," both physicians responded, "No."

However, the most important mental health treatment record that these two (2) physicians did not review in determining Plaintiff's limitations and restrictions resulting from her mental health limitations involves Plaintiff's psychiatric hospitalization in June of 2012. (Tr. 582-583, 708-712). It was during this hospitalization that Plaintiff presented with an increase in her psychiatric

symptoms, and Dr. Miller opined that Plaintiff was disabled for a period of twelve (12) or more months. (Tr. 582-583, 710). As discussed, in order for the ALJ to properly give any weight to a medical opinion, the entire medical record must have been available for and reviewed by the non-examining, non-treating physician. See Sassone, 165 F. App'x 954, 961 (3d Cir. 2006). However, as discussed, the entire medical record was not available to the non-examining, non-treating physicians whose opinions were afforded significant and limited weight by the ALJ.

Being that Dr. Miller was the only other physician who provided a medical opinion regarding functional limitations that resulted from Plaintiff's mental health impairments, and this opinion was not reviewed by the state agency physicians that the ALJ relied on in reaching her RFC determination, the ALJ seemingly relied on her own substituted medical opinion to reach the RFC determination that Plaintiff only had limited functional limitations as a result of her mental health impairments. (Tr. 25-26). The Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own crediblity judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal

41

citations omitted).  In relying on Dr. Popat's opinion that did not take treating physician Dr. Miller's opinion into account, the ALJ therefore relied on her own lay opinion in reaching her RFC determination.

Therefore, because the opinions of the state agency physicians were not well-supported by the entire record as they did not include a review of treating physician Dr. Miller's opinion from June of 2012, and because the ALJ therefore seemingly substituted her own medical opinion in reaching her RFC determination, substantial evidence does not support her RFC determination.  As such, remand on this basis is necessary.

In light of the fact that substantial evidence does not support the ALJ's RFC determination at step four (4) of the sequential evaluation process, a fact which warrants remand, this Court need not address Plaintiff's remaining step four (4) argument that the ALJ erred in finding Plaintiff could return to her past work as a mail carrier.

## CONCLUSION

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), Plaintiff's appeal will be granted, the decision of the Commissioner will be vacated, and the case will be remanded to the

Commissioner for further proceedings.

A separate Order will be issued.

**Date**: October 27, 2014

United States District Judge